UNITED STATES DISTRICT COURT

DISTRICT OF CONNECTICUT

| | |
|---|---|
| UNITED STATES OF AMERICA : | |
| v. : | Docket No. 3:20-cr-158(VLB) |
| WILLIAM TISDOL : | AUGUST 26, 2021 |

## DEFENDANT'S MEMORANDUM IN AID OF SENTENCING

The defendant, William Tisdol, hereby submits this memorandum in aid of sentencing. He respectfully requests a sentence of supervised release. This will not result in his immediate release from prison because of his other pending cases, and it will only begin to run once he is released from all custody. *See* 18 U.S.C. § 3624(e); *see also United States v. Johnson*, 529 U.S. 53, 120 S. Ct. 1114 (2000) (a supervised release term does not commence until an individual is released from imprisonment.) However, as we shall demonstrate, for the purposes of this matter, supervised release is the most appropriate sentence under 18 U.S.C. § 3553(a).

1

Factual and Procedural Background

On September 9, 2020, at around noon, William Tisdol was shot nine times outside of his grandmother's house. He was 20 years old. He had just dropped off his twin baby daughters with his grandmother. He was speaking with his daughters' mother, at their car. Another car drove by, and someone leaned out the window and opened fire. William was shot all over his body; his children's mother was shot as well, though not nearly as badly. As the shooters drove away, William staggered to the house. He wanted to get to his children. Once inside, he tried to support himself on a chair, as blood was flowing out of him. His last memory of that day is of trying to speak words of comfort to his children, and of slipping into unconsciousness as he heard them crying.

He woke up in the hospital in police custody and has been detained continuously since that time. He was arrested on state warrants. See PSR ¶¶ 36-38, 44. He was charged in this case on September 15, 2020, in an indictment under 18 U.S.C. § 371 with conspiracy to transport and possess stolen property.

On December 29, 2020, Mr. Tisdol was charged in a separate indictment under 18 U.S.C. §§ 922(k), 924(a)(l)(B) with possession of a firearm with an obliterated serial number, because he had dropped that gun

on the street when he was shot on September 9. See Docket No. 3:20-cr-264 (JBA). The people who attempted to murder him have not, to this date, been apprehended.

On May 14, 2021, Mr. Tisdol pleaded guilty as charged in this case. On July 7, 2021, Mr. Tisdol pleaded guilty as charged under Docket No. 3:20-cr-264 (JBA). Sentencing before Judge Arterton is presently scheduled for October 8. His state cases remain pending.

Guidelines Range

The Presentence Report calculates Mr. Tisdol's guidelines range as zero to six months. PSR ¶ 57. This is consistent with the plea agreement, and Mr. Tisdol concurs with it.

Discussion

It cannot be disputed that William's life was out of control until he was detained last September. The relevant conduct that this Court can consider is not good. In this case, he engaged in a conspiracy to commit various larcenies at various outlets throughout the northeast. In his other federal case, he possessed a firearm with an obliterated serial number. In state court, he is charged with a plethora of unrelated crimes: interfering/resisting arrest, carrying a pistol without a permit, possessing a weapon in a motor

vehicle, robbery, kidnapping, and larceny. There is no downplaying the gravity of this.

What *can* be said is this: William has pleaded guilty to all of his charges in federal court, and he unreservedly accepts responsibility for them. He admits that he participated in the conspiracy to steal from outlets. He admits that he possessed that gun on the day he was shot. As for the state charges, they are awaiting disposition. He is presumed innocent of those charges. If he is convicted in state court, then that will be his cross to bear, there.

The remainder of this memorandum is concerned with who William Tisdol is *today*.

The reason why I (the undersigned) know what William's last thoughts were before he passed into unconsciousness after he was shot, is because that is the very first story he told me, when I first met him. It was in a small concrete legal visiting room at MacDougall Correctional Institution. He dispensed with the customary trust-building conversations between defendants and appointed counsel. He was open with me. His wounds were still fresh. He wears a colostomy bag to this day. But the vitality in him was irrepressible. He kept calling me "Koch" in a warm and friendly way, humble, as if we already knew each other, and he kept standing up

(carefully) to demonstrate what happened. "Koch," he said—this was before we ever discussed sentencing, much less whether to resolve his case with a plea—"I'll never forget trying to stand there, and stay up, because my babies were crying, and I was trying to get to them to let them know I'd be alright. But I couldn't stay up, Koch. I started blacking out, and I just wanted to touch them. My grandmother was crying, I could hear her screaming *don't pass out, William, don't pass out.*" He paused, and sat down, carefully. "Last thing I remember is the paramedics coming in over me, 'cause I was on the floor by then." He looked down at his clasped hands on the table between us, and shook his head. "I could have died then, Koch. And that would have been it. Done."

That was when I knew two things: First, that William's primary goal in navigating the minefield of his various federal and state charges, was to get back to his kids. Second, flowing from that, despite the roughness of his street education, he was willing to swallow hard and admit his own wrongdoing, because he knew *that* was the way through.

Regarding the "roughness of his street education": In the so-called bad neighborhoods of American cities, intertwined with the negativity, there is a vibrancy. More people than in the suburbs or the urban business districts are outside walking, riding bikes, talking, doing pullups on walk

lights, going in and out of corner stores, gathering on porches. Other places—the Lyme Streets of Connecticut—are well adorned with crisp wicker furniture and empty Adirondack chairs on manicured lawns, and they are safer, but they are devoid of people almost all of the time, and a person walking through can smoke a cigar and talk to himself without anyone smelling the smoke or hearing him speak.

    By contrast, it is impossible not to be noticed on William's grandmother's street. When the expression "the streets talk" is used, it is streets like Sterling Street that people mean. I almost always go to the scene of where the thing happened, to get a sense of it. In one's office it can seem less important to do this than it always ends up being when one gets there. Normally I am nevertheless free to step out of the car and walk around and think about what happened. This was not possible on Sterling Street. As soon as I pulled over, a car with tinted windows pulled up alongside of me. The passenger window went down, and the young man driving looked at me and gave a solicitous upward nod. I shook my head indicating I wasn't looking for anything. He looked at me for a moment longer, then cruised down the street noticeably slowly, and it seemed he was watching me in his rearview mirror.

I pulled out, circled around, and came back a little while later to try again. But now there was a group of young men on a nearby porch. Their body language, jocular among themselves, grew guarded and suspicious when I pulled up, and it was all eyes on the undersigned once again. I decided it was in everyone's best interests if I moved along.

William was completely unsurprised to hear this and was glad for his attorney's real-world decision making skills when I said I did not stick around. Since that first day when he spoke of being shot, William and I have become truly familiar and friendly. He has told me about his tough uncle who taught him how to fight, and who also would leave you up in a tree if you climbed too high, no matter how young you were or how much you cried, because he was teaching you, with tough love, that you had to find your own way. William has spoken tearfully of family and friends he lost to the ever-present violence. He has explained the guilt he feels for not having been able to protect everyone. He has repeated the supreme love he feels for his daughters, again and again, and repeated his desire to return home to them. Waking up with tubes coming out of your viscera and the police in your hospital room is a profound wakeup call.

About the tough uncle: William was taught by the male role models in his life (to the extent that they were present) to prepare for a harsh and

unforgiving world, and the way that one deals with that world is to increase one's personal power. So, William developed skills with his fists, and he got into the habit of making money the wrong way.

But William is still very young, and his personal traits are therefore still mutable. He remains more capable of rehabilitation and reform than the average federal defendant. As of September of last year, when he was detained, he lacked "the ability to extricate [himself] from [the] horrific, crime-producing setting" in which he was raised. *Miller v. Alabama*, 567 U.S. 460, 471 (2012).

Therefore, his idea of what true *power* means, is not completely formed. He is still growing, and he is open to growth.

There is something about the way William talks about the people in his life, and expresses unabashed love for his daughters, and the way he tells stories, that suggests an open mindedness, a willingness to explore beyond his own experience, and an aptitude to discover broader understandings of human thought and behavior. *Power* means many things to many people. I do not send books to clients who are not ready for them. But in William's case, he seemed like a good candidate for a book from

outside his realm of familiarity. So, I sent him Thich Nhat Hanh's[1] *The Art of Power*. The author describes power as follows: ""What most people call power Buddhists call cravings. The five cravings are for wealth, fame, sex, fancy food, and lots of sleep. In Buddhism, we speak of the five true powers, five kinds of energy. The five powers are faith, diligence, mindfulness, concentration, and insight. The five powers are the foundation of real happiness; they are based on concrete practices."

This contradicts so much of what is messaged as "power" from many of our mainstream platforms. It particularly challenges that illusory kind of power—power over others rather than over oneself—which seems so necessary to cultivate when you are growing up in an area in which physical violence is a real threat, and the pains of poverty are *not* illusory.

William read this book carefully, slowly, and mindfully while incarcerated. He has talked about it and shared it with his cell mate, who wants a copy. He reflects on it whenever we meet. He appreciates it. This shows that he is thirsty for a better way of doing things, he has intellectual and spiritual potential, and he has the confidence in himself to trust his own process of learning.

---

[1] Thich Nhat Hanh is a 94-year-old Zen monk from Viet Nam, who was nominated for the Nobel Peace Prize by Martin Luther King, Jr.

William's mother, Dondi, is also exemplary of the potential that surrounds her son. She schleps about every day with his babies, caring for them until he comes home, facilitating their visits with him, getting everyone through the pandemic, and so on. She is steady, and realistic, but also deeply emotional about her son's situation. It agonizes her that he was a hair's breadth away from being shot to death on the street. She cries over it, blaming herself for the choices she made that led him to his present predicament, and for her inability to protect him from the ruthlessness of the world. She has endured a lot, but she continues to be there for her son.

The Appropriate Sentence

Mr. Tisdol is requesting a sentence of supervised release, for two main interwoven reasons: It is consistent with the § 3553(a) factors, and he will be facing other sentences for other conduct of which this Court is aware.

The nature and circumstances of the offense are familiar to the Court, which already has sentenced other codefendants in this case. Mr. Tisdol has accepted his responsibility for participating in this highly inauspicious scheme. He explained in the PSR "that he initially went along for the ride... to protect his girlfriend, Aysia Ryan, who was actively engaging in the grab-and-go scheme. He said he became an active participant because Ms.

Ryan had been arrested on multiple occasions, she had several active warrants, and she was pregnant. Mr. Tisdol said he needed money to help support Ms. Ryan and prepare for their soon-to-be-born children." William does not present this as an excuse, but as an explanation. And as an explanation, it is consistent with the undersigned's understanding of William as a young man who was vulnerable to bad judgment calls, but also that he is capable of surpassing this rocky phase, if he continues on his present path of deeper learning, and contemplating his experiences thus far in life. He was also acting partially out of loyalty and love, by joining this scheme, however misguided that was. He now realizes that he should have "put his foot down" and tried to stop the scheme in its entirety. PSR ¶ 18.

Mr. Tisdol's history and characteristics are evident in the PSR and (hopefully) in this memorandum: He is a young man from a tough background who is mindful of his misdeeds and is capable of pulling himself together.

A sentence of time served, in this context, is sufficient to promote respect for the law, and to provide just punishment for the offense. Mr. Tisdol is awaiting sentencing, by Judge Arterton, on the charge of possession of a firearm with an obliterated serial number, and his state cases remain pending disposition. His guidelines range in Judge Arterton's

case, as contemplated by the plea agreement, is 18 – 24 months. However, it is probable that that range will increase to 21 – 27 months as a result of the occurrence of the instant sentencing proceeding, because this proceeding probably will add three points to his Criminal History Category, raising it to a level II. In any event, a sentence of supervised release in this case will not lead to Mr. Tisdol's release. He will still be in prison as a direct consequence of his personal choices. He will be in prison longer than he wants to be. A sentence of supervised release will, however, avoid overly complexifying the question in future proceedings of what time is credited to what sentence. The undersigned represents Mr. Tisdol before Judge Arterton. I will explain to Her Honor the argument I am presently making before Your Honor. Everything will be known to both courts, so that a fair global disposition can be made. Moreover, the conduct in this case is the least serious of all his charges. That is because it does not involve weapons or allegations of violence committed by Mr. Tisdol. The conduct in Judge Arterton's case is more serious because it does involve possession of weapons, in the context of violent acts, and Her Honor will certainly consider that. The conduct alleged in the state cases is the most serious of all. Mr. Tisdol is represented by separate assigned counsel in those cases. The most salient feature of those cases for present purposes is that he is

presumed innocent of them. That said, the following principles of custody and credit apply:

18 U.S.C. § 3585 determines when a sentence commences. With the passage of § 3585, "Congress made clear that a defendant could not receive double credit for his detention time." *United States v. Wilson*, 503 U.S. 329, 337 (1992). Because the State of Connecticut arrested Mr. Tisdol first, it has primary jurisdiction of him. *See Taylor v. Reno*, 164 F.3d 440 (9th Cir. 1998) and *United States v. Smith*, 812 F. Supp. 368 (E.D.N.Y. 1993).

A sentence cannot be ordered to commence at a date prior to its imposition. *United States v. Gonzalez*, 192 F.3d 350 (2d Cir. 1999). Time spent in the custody of the United States Marshal pursuant to a federal writ of habeas corpus ad prosequendum from state custody is not federal custody in connection with the federal offense. *United States v. Mills*, 501 F.3d 9 (1st Cir. 2007) and *Smith*, 812 F. Supp. 368. Therefore, the past year that Mr. Tisdol has spent in state custody may not count toward any federal sentence. That harsh reality alone should weigh in favor of a sentence of supervised release, even if such a sentence would result in Mr. Tisdol's immediate release (which it will not).

If the Court determines that a sentence of imprisonment is warranted, Mr. Tisdol requests that it be short, and that this Court state that it shall run concurrent to any future state sentence. See U.S.S.G. 5G1.3(c) ("If... a state term of imprisonment is anticipated to result from another offense that is relevant conduct to the instant offense of conviction... the sentence for the instant offense shall be imposed to run concurrently to the anticipated term of imprisonment.'") *See also Abdul-Malik v. Hawk-Sawyer*, 403 F.3d 72 (2d Cir. 2005) (when the federal court did not specify whether its sentence is concurrent or consecutive to a future state sentence, and the state court specified that its sentence shall run concurrent to the federal sentence, this determination by the state sentencing court was not binding on federal authorities.)

Mr. Tisdol will also make this same request of Judge Arterton at his sentencing before Her Honor, and/or will ask for a downward variance to account for the reality that we are unable simply to have a single sentencing hearing to determine one appropriate length of imprisonment, so that Mr. Tisdol can know, after this difficult year, when he can return to the fatherhood that he craves.

Additionally, this has been harder time than usual. While in state custody, he has had difficulties as a result of the medical condition caused

by his being shot. Cell mates do not like the odor of colostomy bags. Medical appointments have been hard to come by. He was more vulnerable to COVID-19. He was given a top bunk for a long time, and had to hop in and out of bed, despite his vulnerable guts.

Mr. Tisdol has more miles to travel before he is released; therefore, we are not presenting Your Honor with a specific release plan. We are simply asking that this sentence be gentle. We are, however, developing a release plan to present to Judge Arterton, who will be in a more direct position to determine the propriety of the conditions under which Mr. Tisdol may be released, simply because that sentencing hearing comes second, and his guidelines range there is higher. We do not wish to duplicate efforts or spend CJA money where it is not specifically needed. If, however, this plan is complete before sentencing in this matter, we will present it to Your Honor as well.

## CONCLUSION

For all of the foregoing reasons, Mr. Tisdol requests that this Court sentence him to a term of supervised release. If this would not please the Court, he requests a very brief term of imprisonment, to run concurrently with any future state sentence.

Respectfully Submitted,

The Defendant, William Tisdol,

/s/ _____W.T. Koch III_____
W. Theodore Koch III
Fed. Bar #ct26854 - CJA Counsel
Koch, Garg & Brown
8 W. Main Street, Suite 2-10
Niantic, CT 06357
Phone: 860-452-6860
Fax: 860-452-6865
ted@kgb-law.com

CERTIFICATION OF SERVICE

I hereby certify that on August 26, 2021, a copy of the foregoing motion was filed electronically and served by mail on anyone unable to accept electronic filing. Notice of this filing will be sent via e-mail to all parties by operation of the Court's electronic filing system or by mail to anyone unable to accept electronic filing as indicated on the Notice of Electronic Filing. Parties may access this filing through the Court's CV/ECF Filing System.

/s/ _____W.T. Koch III_____
W. Theodore Koch III
Fed. Bar #ct26854 - CJA Counsel
Koch, Garg & Brown
8 W. Main Street, Suite 2-10
Niantic, CT 06357
Phone: 860-452-6860 / Fax: 860-452-6865
ted@kgb-law.com